AO 106 (Rev. 4/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

A silver colored Apple iPhone (model MQ3X2LL/A), bearing serial number FFMW633KHYFK, assigned phone number (414) 544-5488 (hereinafter DEVICE 1); a dark grey Apple iPhone (model NQ722LL/A), bearing serial number GGKXV0LHJC6C, assigned phone number (651) 968-6721 (hereinafter DEVICE 2). Both DEVICE 1 and DEVICE 2 are currently secured at the North Central HIDTA Office, located at 801 W. Michigan St., Milwaukee, WI 53233.

Case Number: 19-830 M (NJ)

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, Nick T. Stachula, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

A silver colored Apple iPhone (model MQ3X2LL/A), bearing serial number FFMW633KHYFK, assigned phone number (414) 544-5488 (hereinafter DEVICE 1); a dark grey Apple iPhone (model NQ722LL/A), bearing serial number GGKXV0LHJC6C, assigned phone number (651) 968-6721 (hereinafter DEVICE 2). Both DEVICE 1 and DEVICE 2 are currently secured at the North Central HIDTA Office, located at 801 W. Michigan St., Milwaukee, WI 53233.

located in the Eastern District of Wisconsin there is now concealed: **Please see attached affidavit, which is hereby incorporated by reference.**

The basis for the search warrant under Fed. R. Crim. P. 41(c) is (check one or more):
   ✓ evidence of a crime;
   ☐ contraband, fruits of a crime, or other items illegally possessed;
   ✓ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:
   Title 21, United States Code, Sections 841(a)(1) and 843(b).

The application is based on these facts:
   ✓ Continued on the attached sheet, which is incorporated by reference.
   ☐ Delayed notice of 180 days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Applicant's signature
Name and Title; Nick T. Stachula, Task Force Officer, DEA

Sworn to before me, and signed in my presence.
Date February 21, 2019

City and state: Milwaukee, Wisconsin

THE HONORABLE NANCY JOSEPH
United States Magistrate Judge
*Name & Title of Judicial Officer*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Nick T. Stachula, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND AND INFORMATION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer, assigned to the HIDTA Drug Gang Task Force DEA Group 68 in Milwaukee, Wisconsin. I have been a law enforcement agent for over eighteen years and a Task Force Officer for over two years. From November 2000 to present, I served as a Patrol Officer/Detective with the West Allis Police Department.

3. In the course of my work, I have become knowledgeable with the enforcement of federal laws pertaining to narcotics and dangerous drugs. I have participated in drug trafficking investigations conducted by the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances.

4. I am currently a member of the North Central (formerly Wisconsin) High Intensity Drug Trafficking Area Task Force (HIDTA) assigned to the Drug Gang Task Force initiative as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I have conducted hundreds of drug investigations in my over eighteen years of law enforcement experience and received continual training in that and other fields. I am familiar with various methods of smuggling and trafficking narcotics and other controlled

substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers.

5. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable and form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein.

6. Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause to believe that the electronic device described herein contains evidence relating to the possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and/or a communication facility was used to facilitate the distribution and/or possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 843(b).

### I. IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is a silver colored Apple iPhone (model MQ3X2LL/A), bearing serial number FFMW633KHYFK, assigned phone number (414) 544-5488 (hereinafter DEVICE 1), and recovered from the driver's side floor of a blue 2018 Kia Sedona bearing New York plates numbered JBC-3424 on February 18, 2019 near 2311 N. Sherman Blvd., Milwaukee, Wisconsin 53210; and a dark grey Apple iPhone (model NQ722LL/A), bearing serial number GGKXV0LHJC6C, assigned phone number (651) 968-6721 (hereinafter DEVICE 2), and recovered from the right front pants pocket of Phong VANG incident to his arrest on February 18, 2019. Both DEVICE 1 and DEVICE 2 are currently secured at the North Central HIDTA Office, located at 801 W. Michigan St., Milwaukee, WI 53233.

8. The applied-for warrant would authorize the forensic examination of DEVICE 1 and DEVICE 2 for the purpose of identifying electronically stored data more particularly described in Attachment B.

## II. PROBABLE CAUSE

9. In December 2018, the West Allis Police Department - Special Investigations Unit and DEA DGTF Group 68/Interdiction commenced an investigation into the suspected drug-trafficking activities of Sivyis XIONG. On December 19, 2018, law-enforcement officers observed XIONG leave his residence at 8624 W. Glendale Ave., Milwaukee, Wisconsin and drIve to ABF Freight at 11307 W. Rogers St., Milwaukee, Wisconsin. Before XIONG's arrival at ABF Freight, a K-9 officer and his narcotics-detecting dog had conducted an open air sniff of a suspect container. The dog alerted to the presence of contraband inside the container. The container had been shipped from Sacremento, California. After XIONG arrived at ABF Freight, he removed boxes and an item wrapped in a sleeping bag from the suspect container. XIONG then placed the boxes onto a flat bed trailer attached to his vehicle and put the sleeping bag concealing the item on the vehicle's backseat. Following XIONG's departure from ABF Freight, a West Allis Police Officer conducted a traffic stop on XIONG. Law-enforcement officer subsequently searched the boxes on the trailer and the interior of the vehicle. Inside the boxes, the officers found approximately 52.5 kilograms of marijuana; and inside the vehicle, the officers found approximately 2.7 kilograms of crystal methamphetamine (wrapped in six heat-sealed packages) concealed within the sleeping bag.

10. Law-enforcement officers subsequently obtained a state warrant to search 8624 W. Glendale Ave., Milwaukee, Wisconsin (XIONG's residence). Upon executing the warrant, the officers found and seized an additional 22.1 kilograms of marijuana, four handguns, a shot gun,

digital scales, packaging materials, and a total of $55,783 in U.S. currency. Law-enforcement officers arrested XIONG, who is currently pending charges in Milwaukee County for Possession with Intent to Deliver >10,000 grams of Marijuana, Possession with Intent to Deliver >50 grams of Methamphetamine, and Maintaining a Drug Trafficking Place.

11.     Your Affiant contacted DEA Special Agent (SA) Omar Bersamina in Sacramento, California regarding this investigation. SA Bersamina retrieved records from an Econo Lodge Hotel, located at 3796 Northgate Blvd., Sacramento, California 95834. The records disclosed that Phong VANG, whose listed address was 1080 Maryland Ave. E, Saint Paul, Minnesota 55106, rented room 236 from December 12, 2018 to December 13, 2018 for two (2) adults and paid cash. DEA SA Nicolas Melser from the Minneapolis/St. Paul office confirmed that Phong VANG was an Asian male, DOB: December 14, 1984, who resided at 1080 Maryland Ave. E., St. Paul, Minnesota 55106, and had Minnesota driver's license no. W383245801414.

12.     On January 7, 2019, law-enforcement officers obtained a state warrant to search the contents of two cell phones seized from XIONG incident to his arrest on December 19, 2018. The contents of XIONG's cell phones disclosed a series of text communications with a cell phone assigned number (414) 544-5488, i.e., DEVICE 1. A string of text communications between XIONG's phones and DEVICE 1 appeared to relate to the illegal drugs XIONG retrieved from the ABF Freight container on December 19, 2018. The pertinent text strings are as follows:

*December 12, 2018*

DEVICE 1: No speeding

DEVICE 1: Call us when your done

DEVICE 1: 3796 North Blvd Sacramento, CA. 95834[1]

*December 13, 2018*

XIONG PHONE: What room

DEVICE 1: 236

*December 19, 2018*

XIONG PHONE: Today is the day, If I don't get back to u by 1 then u know what to do

*December 19, 2018 (texts received after XIONG's arrest)*

DEVICE 1: I don't get it? If pass 1 today? that means it made it?

DEVICE 1: Hey bro call me so I know what I need to do to come there

DEVICE 1: You gotta hit us up

DEVICE 1: Civic[2] you gotta let me know what's good. I will be in mke[3] tomorrow

*December 20, 2018*

DEVICE 1: Hey man wassup why you ain't responding back to me. What's good with it

DEVICE 1: What's good with you man?

13.  Your Affiant searched open Facebook records and located a "Phong VANG" from Saint Paul, Minnesota. According to the open Facebook records, "Phong VANG" listed Connie M. XIONG as his spouse. Your Affiant also observed a Facebook posting wherein "Phong VANG" appeared to be working in marijuana fields during harvest season.

14.  On January 30, 2019, your Affiant called DEVICE 1 and asked for a fictitious person. A male answered DEVICE 1 and advised that your Affiant had the wrong number. Having

---

[1] As noted above, this is the address for the Econo Lodge Hotel in Sacramento, California where Phong VANG and another guest stayed between December 12, 2018 and December 13, 2018. Sacremento, California is the city where the drug-laden ABF Freight container originated.
[2] "Civic" is an alias used by XIONG.
[3] MKE is not only the IATA airport code for Milwaukee Mitchell International Airport, but is also commonly used as a shorthand reference for Milwaukee, Wisconsin.

listened to VANG's voice during his post-*Miranda* interview on February 18, 2019, your Affiant believes the person who answered DEVICE 1 on January 30, 2019 was likely VANG.

15. On February 1, 2019, your Affiant obtained a state trap and trace/ping warrant for DEVICE 1. Thereafter, on February 6, 2019, DEVICE 1 indicated it was in Denver, Colorado in close proximity of Denver International Airport. On the same date at 8:59 p.m., "Phong VANG" posted an image of himself on Facebook in front of an airplane with the comment, "The life of an traveler." At the time of this Facebook posting, DEVICE 1 indicated that it was at the Denver International Airport. The location information derived from DEVICE 1 suggested VANG had ultimately traveled to California and returned to St. Paul, Minnesota on February 11, 2019. VANG had a pattern of traveling from St. Paul, Minnesota to Milwaukee, Wisconsin after having previously travled to California.

16. On February 16, 2019, your Affiant received information that VANG was likely traveling southeast on I-94 from St. Paul, Minnesota to Milwaukee, Wisconsin. As noted above, investigators previously determined that VANG had traveled to California on February 6, 2019, and had returned to St. Paul, Minnesota on February 11, 2019. On February 18, 2019, at approximately 1300 hours, TFO Vincent Lopez observed VANG in the alley between North 46th Street and North 47th Street, in the 2900 block, in Milwaukee, Wisconsin. At this time, DEVICE 1 was in contact with a known high-level marijuana and cocaine distributor in the Milwaukee Metropolitan Area. Your Affiant observed this known drug distributor arrive in the alley in a red Dodge Charger and meet with VANG behind a residential garage. At this time, VANG and the known drug distributor had a brief meeting by the trunk of the red Dodge Charger. Based on your Affiant's training and experience, VANG appeared to be conducting a drug transaction with the known drug distributor in the alley. At the conclusion of the transaction, law-enforcement officers

observed VANG depart the location in a blue 2018 KIA Sedona bearing New York license plates numbered JBC-3424. The KIA was a rental vehicle.

17. Soon after the KIA departed the alley, law-enforcement officers conducted a traffic stop on the vehicle in the 2300 block of N. Sherman Boulevard in Milwaukee, Wisconsin. During the traffic stop, VANG was asked if he had anything illegal inside the vehicle. VANG informed the law-enforcement officers that marijuana and a firearm were inside the KIA. Based upon this information, the law-enforcement officers conducted a search of the vehicle. Inside the vehicle, the officers found nearly 16 kilograms of marijuana concealed inside duffle bags, trash bags, and suit cases located in the rear of the vehicle; approximately $50,000 in U.S. currency was located in a back pack, the center console, and under a blanket behind the front driver's seat; DEVICE 1 on the floor between the driver's seat and center console; and a Glock 19 9mm pistol located inside the vehicle's glove compartment. The firearm contained a fully loaded magazine; however, it did not have a round in the chamber. Law enforcement officers then placed VANG under arrest.

18. As noted above, upon searching the KIA, law-enforcement found DEVICE 1 on the driver's side floor, between the driver's seat and center console. Soon thereafter, your Affiant called (414) 544-5488 and immediately observed your Affiant's cell phone number appear on DEVICE 1's display screen. Upon searching VANG incident to his arrest, law-enforcement found DEVICE 2 inside VANG's front right pants pocket.

19. Based on my training and the experience, I know that drug traffickers often use multiple cell phones to conduct their illegal activities. Using multiple cell phones provides several advantages to drug traffickers. First, drug traffickers know that it is more difficult for law enforcement to investigate the use of multiple cell phones than the use of one cell phone. Second, using multiple cell phones allows for drug traffickers to easily "drop" a cell phone periodically,

i.e., stop using a particular cell phone for fear that it may be intercepted or otherwise monitored by law enforcement, because they have additional cell phone numbers that their customers and/or suppliers are already using. Third, using different cell phones allows drug traffickers to insulate and protect different parts of their drug-trafficking organization. For example, a drug trafficker might use one phone number to communicate with his supplier, and another phone number to communicate with his customers. That separation makes it more difficult for law enforcement to connect the various conspirators in the illegal activity. Thus, in my experience, drug traffickers often use multiple phone numbers to conduct their illegal business, as in this case.

20. In a post-*Miranda* interview, VANG admitted to distributing pound-quantities of marijuana. Specifically, VANG said he had sold three pounds of marijuana to the individual in the alley between North 46th and North 47th Streets prior to his vehicle stop. VANG explained that he had transported the marijuana from St. Paul, Minnesota to Milwaukee to sell it to his Milwaukee-based customer. VANG also said the firearm found in the KIA served as protection; specifically, from violent individuals. VANG admitted to traveling to California and that he had recently been there. VANG admitted to traveling to California in mid-December 2018. He intiialy was untruthful about meeting with Sivyis XIONG while in Scaremeno, California. Although VANG admitted to sending text messages (referenced in paragraph 12 above) to XIONG, VANG denied any involvement with shipping the marijuana and methamphetamine seized by law enforcement on December 19, 2018. VANG instead claimed the text messages concerned a $1,800 debt that XIONG owed to VANG. VANG admitted to owning/possessing DEVICE 1 and DEVICE 2, and provided their coresponding numbers – (414) 544-5488 and (651) 968-6721, respectively.

21. DEVICE 1 and DEVICE 2 are currently in the possession of the North Central HIDTA Office, located at 801 W. Michigan St., Milwaukee, WI 53233. They came into the North Central HIDTA Office's possession following the arrest of VANG at 2311 N. Sherman Blvd. Milwaukee, Wisconsin on February 18, 2019. Therefore, while the North Central HIDTA Office might already have all necessary authority to examine DEVICE 1 and DEVICE 2, your Affiant seeks this additional warrant out of an abundance of caution to be certain that an examination of DEVICE 1 and DEVICE 2 will comply with the Fourth Amendment and other applicable laws.

22. DEVICE 1 and DEVICE 2 are currently in storage at the North Central HIDTA Office, located at 801 W. Michigan St., Milwaukee, Wisconsin 53233. In my training and experience, I know that DEVICE 1 and DEVICE 2 have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when DEVICE 1 and DEVICE 2 first came into the possession of the North Central HIDTA Office.

### III.   TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone

numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations.

PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and research, I know that DEVICE 1 and DEVICE 2 have the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA and has the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### IV. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how DEVICE 1 and DEVICE 2 were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on DEVICE 1 and DEVICE 2 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of DEVICE 1 and

DEVICE 2 consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V. CONCLUSION

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of DEVICE 1 and DEVICE 2 described in Attachment A to seek the items described in Attachment B.

# ATTACHMENT A

The property to be searched is a silver colored Apple iPhone (model MQ3X2LL/A), bearing serial number FFMW633KHYFK, assigned phone number (414) 544-5488 (hereinafter DEVICE 1), and recovered from the driver's side floor of a blue 2018 Kia Sedona bearing New York plates numbered JBC-3424 on February 18, 2019 near 2311 N. Sherman Blvd., Milwaukee, Wisconsin 53210; and a dark grey Apple iPhone (model NQ722LL/A), bearing serial number GGKXV0LHJC6C, assigned phone number (651) 968-6721 (hereinafter the DEVICE 2), recovered from the right front pants pocket of Phong VANG incident to his arrest on February 18, 2019. Both DEVICE 1 and DEVICE 2 are currently secured at the North Central HIDTA Office, located at 801 W. Michigan St., Milwaukee, WI 53233.

DEVICE 1



DEVICE 2



## ATTACHMENT B

1. All records on DEVICE1 and DEVICE 2 described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 843(b), and involve Phong VANG, including, but not limited to:

   a. Electronic drug or money ledgers, drug distribution or customer lists and related identifying information, drug supplier lists (including names, addresses, phone numbers, or any other identifying information); correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   b. Electronic telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

   c. Records, items and documents stored on DEVICE 1 and DEVICE 2 reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel from December 2018 to the present;

17

d. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, checks, credit card records, safe deposit box records, records and receipts and rental agreements for storage facilities, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

e. Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, or other activities related to drug trafficking or money laundering; and

f. Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

2. Evidence of user attribution showing who used or owned DEVICE 1 and DEVICE 2 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

18

Case 2:19-mj-00830-NJ   Filed 03/05/19   Page 19 of 19   Document 1

d. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, checks, credit card records, safe deposit box records, records and receipts and rental agreements for storage facilities, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

e. Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, or other activities related to drug trafficking or money laundering; and

f. Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

2. Evidence of user attribution showing who used or owned DEVICE 1 and DEVICE 2 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.